## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EMMANUEL BLANGO, | ) | 3:23-cv-00212 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM LUDOVICO, JR., JENNIFER | ) | |
| MEDINA ZACCAGNINI, | ) | |
| CONNECTION, INC., COURTNEY | ) | |
| RING, CAITLIN HIRSCH, *and* | ) | |
| BRIANNA WISNIEWSKI, | ) | |
| *Defendants*. | ) | March 7, 2024 |

### AMENDED RULING ON DEFENDANTS' MOTIONS TO DISMISS, AND PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT[1]

Following his release from state prison on special parole status after twenty-one years' incarceration for a sexual assault offense, Plaintiff Emmanuel Blango was transferred to the January Center, a residential sex offender treatment facility located on the grounds of Corrigan Correctional Center in Uncasville, Connecticut. There, he was allegedly subjected to restrictions on his liberty akin to imprisonment, despite that the Connecticut Board of Pardons and Paroles ("BOPP") had imposed conditions of residence in a halfway house and community sex offender treatment upon his release from prison.

He now brings claims on behalf of himself and a putative class for violations of the Fourteenth and Eighth Amendments and for common law false imprisonment against several defendants: Parole Officer William Ludovico, Jr., in his individual capacity, and Chairperson of the BOPP Jennifer Medina Zaccagnini in her official capacity ("the State Defendants");

---

[1] Because the Court has granted Plaintiff's motion for reconsideration of the dismissal of the false imprisonment claim against all Connection Defendants, *see* ECF No. 72, the original ruling has been vacated and this amended ruling is being entered to address that issue.

Connection, Inc., ("Connection"), the private entity that owns and operates the January Center pursuant to a contract it holds with the State of Connecticut; and Connection employees Courtney Ring (Director), Caitlin S. Hirsch (Head Clinical Officer), and Brianna Wisniewski (Assistant Clinical Officer) ("the individual Connection Defendants," and together with Connection "the Connection Defendants"). Plaintiff argues that his transfer to the January Center following his incarceration resulted from impermissible administrative modification of his judicially-imposed sentence and was tantamount to continued detention past his mandatory release date. Plaintiff also brings a First Amendment claim against the State Defendants only, based on restrictions imposed on his Internet and social media use during his term of special parole.

The State and Connection Defendants have each filed separate motions to dismiss. For the reasons explained herein, as to the State Defendants, the Court finds that Ludovico is entitled to qualified immunity on Plaintiff's Fourteenth and Eighth Amendment claims, though these claims may proceed against Zaccagnini. Additionally, the Court holds that Plaintiff has adequately alleged injury in fact in support of standing for his First Amendment claim. As to the false imprisonment claim, the Court finds that Ludovico is entitled to absolute immunity and the claim is not plausibly alleged against Zaccagnini, which Plaintiff concedes.

As to the Connection Defendants, the Court finds that Plaintiff has plausibly alleged that the Connection Defendants were state actors for section 1983 purposes and that the individual Connection Defendants were personally involved in the constitutional deprivations. But he has failed to allege a Fourteenth or Eighth Amendment claim against the individual Connection Defendants because he has failed to show they acted with deliberate indifference. The Court finds, however, that Plaintiff has plausibly alleged Fourteenth and Eighth Amendment claims against

Connection itself, because it has offered no arguments for dismissal of the claims against it. Finally, the false imprisonment claim is plausibly alleged against all Connection Defendants.

Plaintiff's motion for leave to file a second amended complaint is GRANTED IN PART and DENIED IN PART, as the Court will grant Plaintiff leave to file a second amended complaint beyond the proposed complaint he annexed to his motion, which only included new allegations relevant to Plaintiff's standing for his First Amendment claim, to address the deficiencies with the first amended complaint identified in this ruling.

## I.    FACTUAL BACKGROUND

### A.    Special Parole

The Court sets forth the following explanation of special parole under Connecticut law as background.  Unlike regular parole, which allows an inmate to be released from prison under supervision prior to the completion of his or her maximum prison sentence, special parole is an additional period of supervision akin to probation that begins only *after* the expiration of an inmate's maximum term of imprisonment.  Conn. Office of Legislative Research Rep. 2008-R-0175, Special Parole (2008), available at https://www.cga.ct.gov/2008/rpt/2008-R-0175.htm (last visited January 26, 2024).  Under Connecticut law, a sentencing court may impose a period of special parole for a criminal defendant convicted of certain offenses if it determines, "based on the nature and circumstances of the offense, the defendant's prior criminal record and the defendant's history of performance on probation and parole, that a period of special parole is necessary to ensure public safety."  Conn. Gen. Stat. § 54-125e(b)(1); *see also id.* § 53a-70a(b) (requiring imposition of five-year special parole term for a defendant convicted of aggravated sexual assault in the first degree).  In imposing a sentence of special parole, the sentencing court can recommend that an individual comply with any of the conditions set forth in Conn. Gen. Stat. § 53a-30, relating

to conditions of probation and discharge.  *Id.* § 54-125e(b)(2).  These include, among others, that the person reside "in a residential community center or halfway house approved by the Commissioner of Correction," and "satisfy any other conditions reasonably related to the defendant's rehabilitation."  *Id.* §§ 53a-30(a)(9), (17).

After the expiration of his term of imprisonment, a person who has been sentenced to special parole is "automatically transferred to the jurisdiction of the chairperson of the BOPP."  *Id.* § 52-125e(a).  The BOPP is situated within the Connecticut Department of Correction, Conn. Gen. Stat. § 54-124a, and the Department of Correction is responsible for supervising individuals during their terms of special parole, *id.* § 54-125e(a).  The BOPP may require that the person comply with the conditions the sentencing court recommended; in addition, a person sentenced to special parole "shall also be subject to such rules and conditions as may be established by the [BOPP] or its chairperson."  *Id.* § 54-125e(b)(2).  In practice, according to Plaintiff's complaint, the BOPP "effectively has the authority to impose any conditions it wishes on a person serving a sentence of special parole."  Am. Compl., ECF No. 17 ¶ 17.

The BOPP may "retake or reimprison any convict upon parole, for any reason that such panel, or the chairman with the approval of the panel, deems sufficient."  *Id.* § 54-126.  "[W]hen a defendant violates special parole, he is subject to incarceration only for 'a period equal to the unexpired portion of the period of special parole.'"  *State v. Tabone*, 292 Conn. 417, 429 (2009) (quoting Conn. Gen. Stat. § 54-128(c)).

### B.  Plaintiff Blango and The January Center

Unless otherwise noted, the following facts are taken from Plaintiff's amended complaint and assumed to be true for purposes of this ruling.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff was convicted of aggravated sexual assault in the first degree in Connecticut state court on March 24, 2004, and was sentenced to twenty-one years of incarceration and five years of special parole on July 1, 2005.  *Id.* ¶¶ 13–14.  While the sentencing court's judgment is not part of the record before the Court, no party suggests that the sentencing court recommended any particular conditions of special parole, as it was permitted to do under Conn. Gen. Stat. § 54-124e(b)(2).

On or about October 28, 2022, the BOPP panel held a hearing to set the conditions of Plaintiff's special parole, which was to begin upon his release from prison on December 9, 2022.  *Id.* ¶ 19.  The panel ordered as part of his special parole that Plaintiff must:  (1) have no contact with the prior victim; (2) consume no alcohol; (3) undergo "sex offender treatment in the community"; and (4) live in a "halfway house."  *Id.* ¶ 20.  The written order further stated:  "You will participate in a behavioral management program for problem sexual behavior.  You must follow the instructions of program staff as to your course of treatment and may not make any changes without the express permission of the program staff or your parole officer."  *Id.* ¶ 21.

On December 2, 2022, Plaintiff met with Parole Officer Ludovico to discuss his upcoming special parole.  *Id.* ¶ 23.  Ludovico required that Plaintiff sign as a condition of his release a "Computer Access Agreement," which on information and belief is the standard BOPP Form PCS 3202 (Rev 4/22/2009) used for sex offenders on special parole (the "Computer Access Agreement").  *Id.* ¶ 25.  The Agreement imposes several restrictions, including that Plaintiff may only use computers and the Internet as authorized by his parole officer, and may not access "inappropriate" websites, or social media entirely.  *Id.* ¶ 26.  Ludovico also informed Plaintiff that he was to be transferred to the January Center, a decision Plaintiff contends, on information and belief, was made independently by Ludovico, rather than the BOPP panel.  *Id.* ¶¶ 29–30.

The January Center is a residential treatment facility for sex offenders located on the grounds of Corrigan Correctional Center and operated by Connection pursuant to a contract it holds with the Connecticut Department of Correction ("DOC"). *Id.* ¶¶ 31–32, 37. It is the most restrictive sex offender treatment program in the State of Connecticut. *Id.* ¶ 31. Individuals convicted of sex offenses have been transferred to the January Center when their court-ordered prison sentence expired, and they were set to begin their court-ordered terms of post-prison parole or probation. *Id.* ¶¶ 28–29. The average stay is a period of 180 days. *Id.* ¶ 34.

The January Center, sitting on the grounds of a high-security state prison, is surrounded by a high fence of barbed razor wire. *Id.* ¶ 33. Individuals may not leave the January Center without permission and, if permission is granted, they must be escorted at all times by a January Center chaperone. *Id.* ¶ 35. Individuals are threatened with arrest for violating a condition of their probation or parole, should they leave the January Center without permission. *Id.* ¶ 36. Specifically, the DOC's Residential Provider Manual, by which Connection must abide pursuant to its contract, states that a supervised person "shall be considered an escapee or absconder immediately upon realization that the supervised person is out of place," meaning, according to the complaint, that he or she could be charged with an escape offense under Part XII of the Connecticut Penal Code. *Id.* ¶¶ 37–39.

Inside the January Center, individuals are subject to constant surveillance. Video cameras are located in the halls and gym. *Id.* ¶ 40. January Center employees may search individuals' bodies and personal effects and conduct random drug tests without a warrant. *Id.* ¶¶ 41, 44. Any visitors must be pre-approved by the DOC and visits are supervised. *Id.* ¶ 43.

Individuals are also subject to several other restrictions as a matter of Connection and DOC policy. The January Center limits the reading materials and television programming available. *Id.*

¶ 42.  Individuals must also fit all their personal effects into four standard-sized banker boxes, are only permitted to possess five pairs of pants, five shirts, and ten undergarments, and are generally prohibited from having "contraband."  *Id.* ¶¶ 45–47.  Violation of the rule against possession of contraband could result in a charge of violation of parole and an individual's return to prison.  *Id.* ¶ 47.

On December 9, 2022, Plaintiff began his five-year term of special parole and was immediately transferred to the January Center.  *Id.* ¶¶ 22, 36.  Upon arrival, Ring, Hirsch, and Wisniewski, and other January Center employees informed him that if he were to leave the grounds at any time without permission, he would be charged with a violation of his special parole and returned to prison.  *Id.* ¶ 36.

Plaintiff was housed at the January Center from December 9, 2022, to March 21, 2023, and alleges he may be placed back at the January Center at any time during his special parole.  *Id.* ¶¶ 49–50.

## II.    PROCEDURAL BACKGROUND

Plaintiff initiated this action *pro se* pursuant to 42 U.S.C. § 1983.  Compl., ECF No. 1.  The Court appointed Plaintiff *pro bono* counsel, who filed an amended complaint on Plaintiff's behalf. In his amended complaint, Plaintiff brings a Fourteenth Amendment due process claim against all Defendants (Count One), an Eighth Amendment claim alleging cruel and unusual punishment against all Defendants (Count Two), a First Amendment claim against the State Defendants only (Count Three), and a common law false imprisonment claim against all Defendants (Count Four). *See* ECF No. 17.  In his Fourteenth Amendment claim, Plaintiff argues that Defendants' actions of transferring Plaintiff to the January Center constituted an impermissible administrative modification of his judicially-imposed sentence.   In his Eighth Amendment claim, Plaintiff

contends that it was cruel and unusual punishment to have subjected him to what is effectively imprisonment at the January Center, when he had already completed his term of imprisonment. Likewise, his false imprisonment claim alleges that Defendants illegally restrained him. Finally, Plaintiff alleges that the Computer Access Agreement he was forced to sign violates his First Amendment rights.

Plaintiff alleges that members of the putative class were subject to the same restrictions on liberty as him, and he seeks to represent classes of persons: (a) housed at the January Center since June 1, 2020; and, separately, (b) subject to blanket Internet usage restrictions like the one imposed on him. *Id.* ¶¶ 53–56.

Plaintiff seeks compensatory and punitive damages against every Defendant except Zaccagnini, who is sued only in her official capacity; he seeks an injunction directing Zaccagnini to cease imposing blanket restrictions on Internet and social media usage as a condition of parole (including to cease using the Computer Access Agreement). He also seeks declaratory relief that that the conditions at the January Center were unconstitutional. *Id.* at 14.

Defendants moved to dismiss the amended complaint. In response to Defendants' motions, Plaintiff filed, in addition to an opposition to the motions, a motion for leave to amend to the extent that the Court finds his existing allegations of injury in fact for his First Amendment claim deficient (along with copy of the proposed second amended complaint). Mot. to Amend, ECF No. 47.

Following oral argument on the motions, the Court ordered supplemental briefing on whether Ludovico was entitled to qualified immunity as to Plaintiff's Fourteenth Amendment claim, which both parties filed. Defs.' Suppl. Br., ECF No. 61; Pl.'s Suppl. Br., ECF No. 62.

As noted above, following the granting of Plaintiff's motion for reconsideration of the Court's original decision on Defendants' motions to dismiss insofar as it dismissed the false

imprisonment claim against the Connection Defendants, the Court issues this amended ruling on Defendants' motions to dismiss.

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted.   When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* at 678.   This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully."   *Id.*   In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."   *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).   Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* (citing *Twombly*, 550 U.S. at 555).   Ultimately, "[d]etermining whether a complaint states a plausible claim for relief

will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.     STATE DEFENDANTS' MOTION TO DISMISS

The Court holds that Ludovico is entitled to qualified immunity on the Fourteenth and Eighth Amendment claims, but that such claims may proceed against Zaccagnini.  The Court further holds that the First Amendment claim may proceed as alleged in the amended complaint, though Plaintiff is free to revise this count in his second amended complaint; and that the false imprisonment claim may not proceed against either Ludovico or Zaccagnini, as Ludovico is entitled to absolute immunity and Plaintiff concedes he has failed to allege that Zaccagnini acted with the requisite intent on that claim.

### A.   Fourteenth and Eighth Amendment Claims:  Qualified Immunity

The State Defendants' sole argument in support of dismissal of the Fourteenth and Eighth Amendment claims is that Ludovico is entitled to qualified immunity.  As they make no arguments seeking dismissal of these claims against Zaccagini, such claims survive against her in her official capacity.  For the reasons described below, the Court finds that Ludovico is entitled to qualified immunity on Plaintiff's Fourteenth and Eighth Amendment claims.

#### 1.  Legal Standard

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability while they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The United States Supreme Court has set forth a two-pronged test governing the qualified immunity defense. "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Id.* at 232. Second, "the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Thus, qualified immunity "bars a plaintiff's claim unless (1) the official violated a . . . constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). Courts have discretion to decide which of the two prongs to address first. *Pearson*, 555 U.S. at 236; *Nat'l Rifle Ass'n v. Vullo*, 49 F.4th 700, 714 (2d Cir. 2022).

Relevant to the second prong, "whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of New York*, 374 F.3d 93, 108 (2d Cir. 2004). An officer's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Put another way, law is "clearly established" when, at the time of the officer's conduct, the "legal principle [had] a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *see also Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018) ("And, because officers cannot have fair warning of rights that are not yet established, we look to precedent in existence at the time of the events."). The rule "must be 'settled law,'" meaning "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 533 U.S. at 63 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and then, *al-Kidd*, 563 U.S. at 741–42).

There need not be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 536 U.S. at 741.

The "clearly established" standard also requires the settled law to be "particularized to the facts of the case," *White v. Pauly*, 580 U.S. 73, 79 (2017), which "requires a high degree of specificity," *Wesby*, 583 U.S. at 63 (citation and internal quotation marks omitted).  By requiring the law to be clearly established to a particularized degree, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (citation and internal quotation marks omitted).

Although qualified immunity defenses are often decided on motions for summary judgment, "in appropriate circumstances a district court may address qualified immunity at the pleading stage." *Vullo*, 49 F.4th at 714 (citing *Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015)). When a defendant presents a qualified immunity defense on a motion to dismiss, "'the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support the claim, but also those that defeat the immunity defense.'" *Matzell*, 64 F.4th at 434 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  The Second Circuit has recognized that "a qualified immunity defense 'faces a formidable hurdle' at the motion to dismiss stage 'and is usually not successful.'" *Id.* (quoting *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir. 2022)).  Nonetheless, the Supreme Court has "repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage [of the] litigation.'" *Wood v. Moss*, 572 U.S. 744, 755 n. 4 (2014) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

### 2.  Discussion

The Court holds that Ludovico is entitled to qualified immunity as to Plaintiff's Fourteenth and Eighth Amendment claims.

Ludovico's primary argument is that he did not violate clearly established law, as neither the U.S. Supreme Court nor the Second Circuit has held that placement of a special parolee at a location with conditions like those of January Center would violate the parolee's constitutional rights.  Indeed, Ludovico argues, the Connecticut Supreme Court explicitly held in *State v. Imperiale*, 337 Conn. 694 (2021), that the January Center is *not* equivalent to incarceration and placement there violates neither a probationer's Fourteenth Amendment due process rights nor his Eighth Amendment right to be free from cruel and unusual punishment.  In arguing this issue, neither Plaintiff nor Ludovico treat Plaintiff's Fourteenth and Eighth Amendment claims separately, as both blur the claims together.  The Court, however, finds it necessary to analyze each alleged constitutional violation separately, as they are legally distinct.

a.   Fourteenth Amendment Claim

Initially, as noted above, the Court retains discretion to analyze the second prong of the qualified immunity inquiry—whether any constitutional right was clearly established—without first reaching the question of whether the officials at issue violated such a constitutional right. *Pearson*, 555 U.S. at 236.  It proceeds in that manner here.

As to his Fourteenth Amendment claim, Plaintiff contends that Ludovico's actions of transferring Plaintiff to the January Center instead of imposing the BOPP panel's conditions of "halfway house" and "sex offender treatment in the community" violated  the clearly established law set forth in *Matzell* and *Betances v. Fischer*, 837 F.3d 162 (2d Cir. 2016) that "a judicially imposed term of incarceration cannot be modified or extended other than by a court."  ECF No. 46 at 14.  The Court agrees with Plaintiff that *Matzell* and *Betances* are relevant here, and that it was clearly established in 2022 that "any alteration to a sentence imposed by a judge, unless made by a judge in a subsequent proceeding, is invalid."  *Matzell*, 64 F.4th at 439.  The Court cannot

find, however, that it was clearly established at the relevant time that Ludovico's placement of Plaintiff at the January Center amounted to an improper alteration of a sentence imposed by a judge, as explained below.[2]

In *Matzell*, the sentencing judge ordered that the plaintiff be enrolled in a bootcamp program that, if successfully completed, would have allowed for the plaintiff to be released from prison early. 64 F.4th at 429. The correctional defendants nonetheless denied the plaintiff admission into that program because he had received disciplinary tickets while in prison. *Id.* In assessing the district court's denial of a motion for judgment on the pleadings on qualified immunity grounds, the Second Circuit granted the defendants qualified immunity as to the plaintiff's Eighth Amendment claim because there was no precedent at the time establishing that their conduct violated the Eighth Amendment. *Id.* at 436. The Second Circuit rejected the defendants' assertion of qualified immunity on the Fourteenth Amendment claim, however, because their decision to disqualify the plaintiff from enrolling in the bootcamp "diverged from the sentencing court's order," and it had been clearly established by that time that if a sentence was imposed by a judge—as the bootcamp was—only a judge could modify it. *Id.* at 436, 439 (citing *Earley v. Murray* 451 F.3d 71 (2d Cir. 2006), *superseded by statute*, N.Y. Corr. Law 601-d).

*Betances* concerned instances in which the New York State Department of Correctional Services added terms of post-release supervision to inmates' sentences, despite that those sentencing judges had not imposed post-release supervision. *See generally* 837 F.3d at 164–70. The Second Circuit had already held that such a practice was unlawful. *Id.* at 171 (quoting *Vincent*

---

[2] Counter to Ludovico's suggestion, there is no legal basis to conclude that qualified immunity is warranted simply because the Court ordered supplemental briefing on the issue. ECF No. 61 at 5. Rather, the Court ordered supplemental briefing because it perceived deficiencies in both parties' original treatment of this issue.

*v. Yelich*, 718 F.3d 157, 168 (2d Cir. 2013), for the proposition that it is "clearly established that where the [sentencing] court has not included [post-release supervision] in a defendant's sentence, [New York State's Department of Correctional Services] may not add that term without violating federal law").

Based on these two cases, Plaintiff argues that Ludovico violated clearly established law when he assigned Plaintiff to the January Center; he claims this placement impermissibly modified the sentencing judge's order that he be placed on special parole because the January Center is substantially similar to prison. But Plaintiff elides key factual distinctions between his case and *Matzell* and *Betances*, and thus seeks to define the clearly established law at too high a level of generality. In *Matzell* and *Betances*, correctional defendants modified the plaintiffs' sentences in contradiction of the sentencing judges' orders: the sentencing judge had ordered that the plaintiff be allowed to participate in the bootcamp in *Matzell*, and the sentencing judge had declined to impose post-release supervision in *Betances*.

Here, by contrast, the sentencing judge ordered Plaintiff to be placed on special parole— without specifying particular conditions of that parole—and *the BOPP panel* imposed the conditions that Plaintiff be placed in a "halfway house" and "sex offender treatment in the community." Thus, at best and accepting Plaintiff's allegation that Ludovico acted beyond his authority, Ludovico would have modified the conditions imposed by the BOPP, not by the sentencing judge. This is therefore not a claim that Ludovico altered the judge's general sentence of special parole but, rather, a claim that Ludovico altered the conditions of special parole imposed *by the BOPP panel*. *See* ECF No. 17 ¶ 24 ("During this meeting, Defendant Ludovico imposed several special parole conditions that had not been specified by the BOPP panel assigned to Plaintiff's case.").

15

Plaintiff has pointed the Court to no cases finding that, when a probation officer imposes conditions in alleged contravention of the orders of an administrative body to which authority to set conditions of special parole have been delegated, there has been an improper modification of a *sentencing judge's order* and thus a Fourteenth Amendment violation.  To the contrary, Plaintiff acknowledges that under Connecticut law "the BOPP effectively has the authority to impose any conditions it wishes on a person serving a sentence of special parole."  *Id.* ¶ 17.  This further suggests Ludovico's actions do not amount to an alteration of the judge's sentence because the BOPP retains broad authority to craft any conditions of special parole after it is imposed by the judge.  Indeed, under the statutory scheme, the sentencing judge may only *recommend* conditions of special parole, and the BOPP panel ultimately decides whether to impose the conditions the judge recommended, or to impose other conditions it deems appropriate.  Conn. Gen. Stat. § 54-125e(b)(2).  In effect, the BOPP panel—not the sentencing judge—has the final word on what particular conditions of special parole are imposed.  Here, there is no suggestion that the sentencing judge even recommended particular conditions; therefore, Ludovico's decision to place Plaintiff at the January Center thus could have modified only the BOPP panel's conditions.

Plaintiff argues that the distinction between whether Ludovico modified the sentencing judge's order or the BOPP panel's order is largely illusory because *Matzell* generally protects Plaintiff's Fourteenth Amendment "interest in having his sentence implemented *in a manner consistent with* law and the sentencing court's order."  ECF No. 62 at 3–4 (quoting *Matzell*, 64 F.4th at 437).  To begin, factual distinctions are generally *not* illusory in the qualified immunity context, where courts must determine whether the law was clearly established with "a high degree of specificity."  *Wesby*, 583 U.S. at 63.  But even accepting Plaintiff's framing, the Court cannot conclude it was clearly established that Plaintiff's transfer to the January Center would be clearly

"inconsistent" with either the sentencing judge's order of special parole or the BOPP panel's terms of "halfway house" and "sex offender treatment in the community."  Although Plaintiff argues that the January Center is effectively a continuation of his prison sentence (and therefore a deviation from his sentence of post-release special parole), he has pointed to no case holding that the January Center or a placement materially similar to it is effectively imprisonment, or is not a halfway house or "sex offender treatment in the community."  At most, Plaintiff cites to cases distinguishing treatment in a "community setting" from treatment in a residential, institutionalized setting.  These cases are outside the prison context, however, and Plaintiff's argument ignores that the BOPP panel ordered placement in a "halfway house" in addition to "sex offender treatment in the community."  *See Davis v. Shah*, 821 F.3d 231, 263–64 (2d Cir. 2016) (discussing community-based treatment of disabled individuals under the Americans with Disabilities Act); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999) (same).

In sum, for qualified immunity purposes, the clearly established law must be particularized to a relatively high degree of specificity, so that the defense "protects all but the plainly incompetent or those who knowingly violate the law."  *al-Kidd*, 563 U.S. at 743 (citation and internal quotation marks omitted).  Because the Court cannot find that *Matzell* or *Betances* would have put Ludovico on notice that his actions of placing Plaintiff at the January Center clearly violated Plaintiff's Fourteenth Amendment rights, he is entitled to qualified immunity on this claim.  Further, although they are not binding on this Court, Connecticut state cases rejecting similar Fourteenth Amendment claims brought by probationers housed at the January Center lend additional support to Ludovico's argument that his actions did not violate clearly established law.

*See State v. Imperiale*, 337 Conn. 694 (2021); *State v. Rivera*, No. FBTCR090241668T, 2019 WL 4733606 (Conn. Super. Ct. Aug. 28, 2019) (unpublished).[3]

The Fourteenth Amendment claim may proceed against Zaccagnini, however, as the State Defendants have not moved to dismiss this claim against her.  As she is sued only in her official capacity for injunctive and declaratory relief, she neither raises nor would be entitled to a qualified immunity defense. *See Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (recognizing that a state official sued in an official capacity cannot assert a qualified immunity defense).

### b.   Eighth Amendment Claim

The Court further agrees with Ludovico that at the time he directed that Plaintiff be transferred to the January Center, the law was not clearly established that placing Plaintiff there would violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff's reliance on *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 (2d Cir. 2020), is misplaced.

In *Hurd*, the plaintiff brought an Eighth Amendment claim after an administrative error caused him to be imprisoned for almost a year past his mandatory release date.  *Id.* at 1081–82. The Second Circuit concluded that "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude" under the Eighth Amendment, but recognized that this rule was not previously clearly established, so the defendant in that case was entitled to qualified immunity.  *Id.* at 1087.  Plaintiff contends *Hurd* clearly established as early as 2020 that the "intentional or deliberately indifferent overdetention of a prisoner beyond his mandatory release date violates the Eighth Amendment."  ECF No. 46 at 13.

Again, however, Plaintiff has defined the "clearly established" law at far too "high [a] level of generality," *White*, 580 U.S. at 552, because the plaintiff in *Hurd* was held in *an actual prison*

---

[3] In light of its holding that Ludovico's actions, as alleged, do not violate clearly established law, the Court does not reach the question of whether it was objectively reasonable for Ludovico to act in reliance on *Imperiale* and *Rivera*.

for nearly a year past his mandatory release date.  Here, as discussed below, the Court holds that Plaintiff has plausibly alleged that the conditions at the January Center were so restrictive that they *may* be tantamount to overdetention.  But this is not the same as finding that Ludovico's alleged conduct violated the clearly established law that a person cannot be held *in prison* past his release date.  It is undisputed that Plaintiff was not held in an actual prison past his mandatory release date, as in *Hurd*.  Plaintiff has identified no cases, and the Court is aware of none, where a federal court has found that conditions similar to those imposed at the January Center constituted overdetention in violation of the Eighth Amendment.

For these reasons, the "constitutional question" of whether Plaintiff was detained at the January Center in violation of *Hurd* is certainly not "beyond debate," and it is appropriate to grant Ludovico qualified immunity as to the Eighth Amendment claim on this basis.  *al-Kidd*, 536 U.S. at 741.  Even drawing all factual inferences in Plaintiff's favor, the Court cannot hold otherwise.

At bottom, Plaintiff's Fourteenth and Eighth Amendment claims are novel in the relevant respects, and the Court cannot find that Ludovico violated clearly established law by placing Plaintiff at the January Center.  Plaintiff's Eighth Amendment claim will, however, similarly proceed against Zaccagnini, as she has not moved to dismiss this claim.

c.  Declaratory Relief

Finally, given its decision that Ludovico is entitled to qualified immunity on the Fourteenth and Eighth Amendment claims, the Court must likewise dismiss Plaintiff's request for declaratory relief against Ludovico.  "[C]ourts generally hold that where public official defendants are shielded by absolute or qualified immunity, purely retrospective declaratory relief is inappropriate." *Franza v. Stanford*, No. 18-CV-10892 (KMK), 2019 WL 6729258, at *9 (S.D.N.Y. Dec. 11, 2019) (citing *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exh. Inc.*, 24 F.3d 427, 431 (2d Cir.

1994)).  Thus, a declaratory judgment that Ludovico violated Plaintiff's Fourteenth or Eighth Amendment rights in the past would be improper, though a similar judgment against Zaccagnini would not, as she is sued only in her official capacity and thus may not assert a qualified immunity defense.

Plaintiff argues the declaratory relief sought against Ludovico is not entirely retrospective, because he could be placed back at the January Center at any time during his period of special parole.  Specifically, he contends the alleged Fourteenth and Eighth Amendment violations are "capable of repetition, yet evading review."  *See* ECF No. 46 at 14 n. 2 (quoting *Solomon v. Emanuelson*, 586 F. Supp. 280, 282 (D. Conn. 1984)).  But as presently framed, the declaratory relief sought against Ludovico is entirely backwards-looking:  in his prayer for relief, Plaintiff states that he seeks "[a] declaration that the confinement of Plaintiffs and others similarly situated at the January Center under the conditions *to which they were subjected violated* the United States Constitution."  ECF No. 17 at 14 (emphasis added).  Thus, the request is for purely retrospective declaratory relief, and there is no basis for such a request to proceed against Ludovico.

## B. First Amendment Claim

The Court next holds that the amended complaint states a viable First Amendment claim against the State Defendants, though Plaintiff may choose to add additional allegations in any amended complaint.  Plaintiff alleges that the State Defendants violated his First Amendment rights by requiring him to sign a Computer Access Agreement, restricting his access to the Internet and forbidding access to social media entirely, as a condition of his special parole.  The State Defendants counter that, because Plaintiff fails to allege that either of the State Defendants enforced these conditions against him and actually prevented him from using social media or restricted his Internet access, he has failed to allege injury in fact for purposes of Article III standing.

20

To establish Article III standing, a plaintiff must demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A.*, 590 U.S. __, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  As the State Defendants acknowledge, however, it is not necessary for Plaintiff to have alleged the actual enforcement of the Computer Access Agreement against him.  Rather, in the First Amendment context, Plaintiff may bring a pre-enforcement challenge if he adequately alleges he was prevented from engaging in Internet and social media use under one of two theories for establishing injury in fact.  More specifically, Plaintiff must have either (1) "'alleged an *intention* to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution,'" or (2) that he "is '*chilled* from exercising her right to free expression and foregoes expression in order to avoid enforcement consequences.'" *Libertarian Party of Conn. v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920, at *4 (D. Conn. Jan. 26, 2016) (emphasis added) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), and then *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014)).

The Court finds that Plaintiff has met this "low" and "quite forgiving" standard with regards to the second "chilling" theory.  *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013).  Plaintiff alleges that he was required to sign the Computer Access Agreement as a condition of his special parole.  ECF No. 17 ¶ 25.  Plaintiff's complaint describes how the BOPP maintained broad authority to revoke his special parole should be found to violate any condition, and that he was aware that he could be arrested on a violation of probation charge.  Drawing all inferences in

Plaintiff's favor, Plaintiff has alleged that he was "chilled" from engaging in the restricted Internet use and social media generally.

On this point, *United States v. Loy*, 237 F. 3d 251 (3d Cir. 2001), is instructive. In that case, the Third Circuit found that the plaintiff had adequately pleaded that a supervised release condition, restricting his ability to possess pornography as a sex offender, "chilled" protected First Amendment activity, and therefore established injury in fact. *Id.* at 265. In reaching this conclusion, the court acknowledged that threats of arrest in the probation or parole context have a unique chilling effect. Specifically, supervisees are aware that should they be charged with a violation, they will not "enjoy the 'full panoply of rights'" in subsequent revocation proceedings, which determine whether they will be returned to prison. *Id.* at 260 (describing the "lower standard of proof," "greater range of evidence that may be admissible against them" including hearsay, "lack of a jury right," and "no right against self-incrimination" revocation proceedings) (citations omitted). Further, "persons under conditions of supervised release are presumably more likely to be 'prosecuted' for their violations," because "these conditions are, after all, special 'laws' tailored only for them." *Id.*

In reply, the State Defendants argue that Plaintiff fails to allege that Ludovico was the parole officer charged with monitoring Plaintiff's compliance with this condition. ECF No. 52 at 8. But this argument concerns whether Ludovico was personally involved in the alleged deprivation; it is not about whether Plaintiff adequately alleged injury in fact (and was not raised in the State Defendants' motion to dismiss). Because Plaintiff has adequately pleaded that he was chilled for injury in fact purposes, this is not a basis to dismiss his amended complaint.

The Court cannot infer from the amended complaint, however, that Plaintiff adequately pleaded an *intention* to engage in the restricted Internet use or social media generally under the

other theory for establishing injury in fact in the First Amendment context.  The amended complaint does not specify which portions of the Internet were restricted, and thus the Court has no basis to infer that Plaintiff intended to access those portions.  As for the blanket restriction on social media, Plaintiff argues it is "obvious" and "common sense" he would seek to use "instant messaging, social networking sites," and/or "a web-based email program which provides the ability to remain anonymous," because he "is an adult who seeks to live and work in society in 2023."  ECF No. 46 at 19.  But social media usage is a matter of personal preference, on which many adults vary.  There is no basis, in the operative complaint, to infer that Plaintiff would fall in the category of adults who would intend to access those restricted portions of the Internet and social media.  Should Plaintiff wish to develop this additional theory of injury in fact, he may include relevant allegations in his second amended complaint, which the Court will permit him to file in light of its ruling partially granting Defendants' motions to dismiss.

### C.  False Imprisonment Claim

Last, the Court grants the State Defendants' motion to dismiss the false imprisonment claim against Zaccagnini and Ludovico.  Plaintiff does not allege any specific actions by Zaccagnini related to his confinement at the January Center, and his counsel conceded at oral argument that this claim is not properly asserted against her.  As to Ludovico, Plaintiff has plausibly alleged Ludovico's intent for purposes of a false imprisonment claim, but the Court finds he is nonetheless entitled to absolute immunity under Conn. Gen. Stat. § 4-165.[4]

"To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, he

---

[4] Although the Court has partially granted the State Defendants' motion to dismiss claims against Ludovico on qualified immunity grounds, it still must reach this question, as "'qualified immunity' protects an official from liability under *federal* causes of action but is not generally understood to protect officials from claims based on state law." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).

did not consent to the restraint or acquiesce in it willingly." *Nodoushani v. S. Conn. State. Univ.*, 152 Conn. App. 84, 92–93 (2014). In addition, the plaintiff must prove that the defendant acted with the requisite intent in imposing that restraint. Specifically, "[a] person is not liable for false imprisonment unless his act is done for the purpose of imposing confinement, or with the knowledge that such confinement will, to a substantial certainty, result from it." *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31 (1999) (quoting 32 Am. Jur. 2d, False Imprisonment § 9). The Connecticut Supreme Court has elaborated that, "[i]n the context of false imprisonment the label of 'reckless' fairly characterizes a state of mind amounting to knowledge that confinement is substantially certain to result from the wrongful conduct but not attaining the proportions of an actual intention to bring it about." *Green v. Donroe*, 186 Conn. 265, 269 (1982). Negligent conduct may give rise to a false imprisonment claim, provided that the defendant also knows or acts in reckless disregard of the fact that confinement will, to a substantial certainty, result from his or her actions. *Id*.

The Court holds that Ludovico is entitled to absolute immunity on the false imprisonment claim under Conn. Gen. Stat. § 4-165. That statute provides that "[n]o state officer or employee shall be personally liable for damages or injury, not wanton, reckless, or malicious, caused in the discharge of his duties or within the scope of his employment." Conn. Gen. Stat. § 4-165. Although the meaning of these terms is not clearly defined, the Connecticut Supreme Court has held that the conduct must amount to "more than gross negligence," and evince "a reckless disregard of the just rights or safety of others or the consequences of the action." *Martin v. Brady*, 261 Conn. 372, 379 (2002).

Plaintiff does not plausibly allege Ludovico acted in at least a reckless manner, particularly in light of *Imperiale*. To start, there are no allegations in the amended complaint from which the

Court can infer Ludovico acted wantonly or maliciously.  As to recklessness, Plaintiff alleges that, in contradiction with the BOPP panel's order that Plaintiff be placed in a "halfway house" and in "sex offender treatment in the community," Ludovico ordered him transferred to the January Center, with conditions Plaintiff claims are akin to imprisonment.  But when Ludovico made this decision, the Connecticut Supreme Court had already decided in *Imperiale* that placement at the January Center was *not* the equivalent of imprisonment.  The Court therefore fails to see how Ludovico could have acted recklessly to falsely imprison Plaintiff, given this decision of the state's highest court.  The Court cannot conclude that Ludovico's conduct constituted "an extreme departure from ordinary care," under the circumstances, and therefore finds that Ludovico is entitled to absolute immunity for the false imprisonment claim.  *See Martin*, 261 Conn. at 379.

## V.     CONNECTION DEFENDANTS' MOTION TO DISMISS

The Court next addresses the Connection Defendants' motion to dismiss.  For the reasons described below, the Court holds that Plaintiff has plausibly alleged, at the threshold, that the Connection Defendants are state actors for purposes of a section 1983 claim, and that the individual Connection Defendants were personally involved in the alleged constitutional violations. Nonetheless, the Fourteenth and Eighth Amendment claims against the individual Connection Defendants are dismissed because Plaintiff fails to sufficiently allege that they acted with deliberate indifference.  The Fourteenth and Eighth Amendment claims against Connection itself, however, survive dismissal.  Finally, the common law false imprisonment claim is plausibly alleged against all Connection Defendants.

### A.  State Actor Requirement

At the outset, the Court holds that Plaintiff has plausibly alleged that the Connection Defendants are "state actors" for section 1983 purposes.

Section 1983 provides individuals with a federal cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen [or] other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws." 42 U.S.C. § 1983. A section 1983 claim contains two elements: "(1) that the defendants deprived [plaintiff] of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

A private actor is a "state actor" for section 1983 purposes when one of three tests is met: when "(1) the State compelled the conduct [the 'compulsion test'], (2) there is a sufficiently close nexus between the State and the private conduct [the 'close nexus' test' or 'joint action test'], or (3) the private conduct consisted of activity that traditionally has been the exclusive prerogative of the State [the 'public function test']." *Hogan v. A.O. Fox Memorial Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order). It is not enough for a plaintiff "to plead state involvement in *some activity* of the institution alleged to have inflicted injury" upon the plaintiff; "rather, the plaintiff must allege that the state was involved *with the activity that caused the injury* giving rise to the action." *Sybalski v. Indep. Grp. Home Living Program*, 546 F.3d 255, 257–58 (2d Cir. 2008) (emphasis in original) (citation and internal quotation marks omitted). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). In any of these three circumstances, a plaintiff may bring a section 1983 claim against an otherwise "private" actor.

The Court agrees with Plaintiff that the Connection Defendants' conduct meets at least the "public function" test, because Plaintiff alleges that the state contracted with Connection to perform the state's traditionally exclusive function of monitoring special parolees. The January Center is a residential facility that houses probationers and parolees convicted of sex offenses, and Plaintiff alleges that the Connection Defendants perform supervision, monitoring, and surveillance functions for those housed there. ECF No. 17 ¶¶ 31, 36, 37–47. The individual Connection Defendants are also alleged to have told Plaintiff that he would be charged with a violation of his special parole and returned to prison if he left the January Center without permission. *Id.* ¶ 36. A reasonable inference from this allegation is that the staff of the January Center would report the absence to the relevant authorities. These allegations, taken together, sufficiently plead that the Connection Defendants engaged in activity that is traditionally the exclusive prerogative of the state, and therefore meets the public function test. *See Jones v. Cnty. of Suffolk*, 164 F. Supp. 3d 388, 396 (E.D.N.Y. 2016) (holding county had delegated an "inherently public function" when it contracted with Parents for Megan's Law for assistance in monitoring the residency reporting of sex offenders); *see also Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) ("[I]nsofar as the Hospital was acting in the latter capacity—as part of the reporting and enforcement machinery for CWA, a government agency charged with detection and prevention of child abuse and neglect— the Hospital *was* a state actor.").

The Court is not persuaded by the Connection Defendants' argument that they should not be treated as state actors because Connection only contracted with the DOC to provide "treatment services," rather than the "safety" services that are central to Plaintiff's claims. ECF No. 42-1 at 5. The Connection Defendants cite no authority to support drawing a razor-thin distinction between the "treatment services" it contracted with the DOC to provide, and ancillary "safety"

restrictions.  After all, they acknowledge that the "treatment services" included "monitoring sex offenders," *id.*, which implicates several of Plaintiff's allegations related to surveillance and confinement, and resembles the public function allegations in *Jones*.  Plaintiff also alleges that, pursuant to its contract with the DOC, the Connection Defendants must abide by the DOC's Residential Provider Manual, which includes provisions related to safety.  ECF No. 17 ¶ 37.  For example, the manual contains the provision that a supervised person "shall be considered an escapee or absconder immediately upon realization that the supervised person is out of place."  *Id.* ¶ 38.  Plaintiff has plausibly alleged the state was involved in the activity by the Connection Defendants that caused the alleged injury.  *Sybalski*, 546 F.3d at 257–58.  The Connection Defendants may therefore be considered state actors for section 1983 pleading purposes.

### B. Personal Involvement

Next, the Court concludes that Plaintiff has plausibly alleged the involvement of each of the individual Connection Defendants—Ring, Director of the January Center; Hirsch, its Head Clinical Officer; and Wisniewski, its Assistant Clinical Officer—in his Fourteenth and Eighth Amendment claims, albeit just barely.  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under § 1983."  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Plaintiff "must directly plead and prove that 'each Government-official defendant,'" or here, each private individual deemed a state actor for section 1983 purposes, "through the official's own individual actions, has violated the Constitution."  *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

A plaintiff can satisfy the "personal involvement" requirement by alleging "personal participation by one who has knowledge of the facts that rendered the conduct illegal."  *Provost v.*

*City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).  This participation can be direct or indirect, such as ordering or helping others commit unlawful acts.  *Id.*

The amended complaint only includes one paragraph specifically naming Ring, Hirsch, and Wisniewski, which reads:

> At the time of his transfer to the January Center, Plaintiff was informed by Defendants Ring, Hirsch, and Wisniewski, and others that, if he were to leave the grounds of the January Center at any time during his placement, he would be charged with a violation of his special parole conditions and returned to prison.

ECF No. 17 ¶ 36.  While sparse, the Court finds this sufficient to allege the personal involvement of the individual Connection Defendants in the allegedly unlawful act of administratively modifying his sentence, in violation of the Fourteenth Amendment, and of confining Plaintiff past his mandatory release date, in violation of the Eighth Amendment. Plaintiff pleads through this paragraph that the individual Connection Defendants effectively verbally threatened him with arrest should he leave the January Center.  As noted above, it is plausible to infer from the allegations of the complaint that the individual Connection Defendants would be the persons to report any impermissible absence to the relevant authorities.  Therefore, to the extent he was unlawfully confined at the January Center, the individual Connection Defendants' communication of these threats of arrest is sufficient to allege their "help" in that unlawful act, minimal though it was.  Counter to the individual Connection Defendants' assertion, the allegation that they made statements to Plaintiff equivalent to threats of arrest should he leave the Center takes this beyond a "kind of official or supervisory" liability that lacks personal involvement.  *See* ECF No. 53 at 2.

Thus, a lack of personal involvement is not a basis to dismiss Plaintiff's complaint against the individual Connection Defendants.

C. <u>Alleged Violations of Fourteenth and Eighth Amendments</u>

The Court next finds that Plaintiff has adequately alleged violations of the Fourteenth and Eighth Amendments against Connection, but not against the individual Connection Defendants. Plaintiff plausibly alleges that the highly restrictive conditions imposed at the January Center are equivalent to continued detention past his mandatory release date, and it is undisputed that he holds a liberty interest in freedom from such confinement.   Plaintiff fails, however, to allege the individual Connection Defendants' actions shocked the conscience, in violation of the Fourteenth Amendment,[5] or that they otherwise acted with deliberate indifference to this reality in violation of the Eighth Amendment.   Connection's only argument for dismissal is that Plaintiff has not plausibly pleaded an Eighth Amendment violation because the January Center is not akin to imprisonment.  As the Court rejects this argument, and because Connection offers no argument for dismissal of the Fourteenth Amendment claim, Plaintiff's constitutional claims against Connection may therefore proceed.

*1. Fourteenth Amendment*

First, the Court dismisses the Fourteenth Amendment claim against the individual Connection Defendants, but not against Connection, the entity.   Initially, the Connection Defendants correctly note that the amended complaint is "not explicit" on whether Plaintiff is pursuing procedural or substantive due process violations, or both.  ECF No. 42-1 at 8.  Plaintiff clarifies in his opposition that he is pursuing a substantive due process theory.  The individual Connection Defendants' argument regarding procedural due process is that Plaintiff has not adequately pleaded their personal involvement in the alleged constitutional violation.   This

---

[5] Plaintiff clarifies in his opposition memorandum that he is only pursuing a substantive due process theory under the Fourteenth Amendment.  ECF No. 46 at 10.

argument applies equally to Plaintiff's substantive due process theory.  As noted above, however, it fails.

The Court must nonetheless consider whether Plaintiff's substantive due process claim is plausibly alleged, at least as against the individual Connection Defendants who contest the due process claim.[6]  Plaintiff's theory is that all Defendants—including the Connection Defendants— "administratively modified and increased the sentences to which Plaintiff and other class members were subject."  ECF No. 17 ¶ 62.  Because only courts have the authority to sentence persons to terms of incarceration, Plaintiff argues, expanding a sentenced prisoner's term of incarceration in this way violates Plaintiff's substantive due process rights.

"The first step in substantive due process analysis is to identify the constitutional right at stake."  *Hurd*, 984 F. 3d at 1087 (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).  If there is a cognizable constitutional right, the plaintiff must then "demonstrate that the state action was so egregious, so outrageous, that it may be said to shock the contemporary conscience."  *Id.* (quoting *Southerland v. City of New York*, 680 F.3d 127, 151–52 (2d Cir. 2012)).

The Connection Defendants do not appear to contest that Plaintiff has a cognizable liberty interest in freedom from detention even when on special parole; nor could they, when the Second Circuit has held that one has "a liberty interest in freedom from detention upon his [or her] conditional release date."  *Hurd*, 984 F.3d 1075; *see also Matzell*, 64 F.4th at 437 (finding that a decision to disqualify the plaintiff from enrolling in rehabilitative bootcamp program "implicated his liberty interest of having his sentence implemented in a manner consistent with law and the sentencing court's order").

---

[6] Because the Connection Defendants make no argument about the viability of the Fourteenth Amendment claim against Connection itself, that claim survives the present motion.  *See* ECF No. 42-1 at 10 (only discussing the Eighth Amendment claim).

But the Court cannot find that the Connection Defendants' actions plausibly "shocked the conscience." *Matzell*, 64 F.4th at 437. The allegations against the individual Connection Defendants are limited to their communication of a threat of arrest, should Plaintiff have left the January Center without appropriate permission. *See* ECF No. 17 ¶ 36. The Court cannot conclude that that allegation, standing alone, plausibly demonstrates that the individual Connection Defendants' actions were so egregious and outrageous as to shock the conscience. Therefore, Count One alleging a Fourteenth Amendment violation is dismissed as to the individual Connection Defendants, but not as to Connection, which did not argue for its dismissal.

### 2. *Eighth Amendment*

A plaintiff asserting an Eighth Amendment claim must allege a deprivation that is sufficiently serious and that the official who caused the deprivation acted with a sufficiently culpable state of mind. *Hurd*, 984 F.3d at 1084. Continuing to detain an individual past his mandatory release date amounts to a "harm of constitutional magnitude" under the Eighth Amendment because such overdetention is punishment "totally without penological justification.'" *Id.* at 1084–86 (quoting *Gregg v. Georgia*, 42 U.S. 153, 173, 183 (1976)). The state of mind required of a defendant is deliberate indifference—"a state of mind that is the equivalent of criminal recklessness." *Id.* at 1084 (quoting *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)). The *Hurd* court noted that the deliberate indifference prong "will do most of the work" in these types of alleged constitutional violations; if, for instance, "a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability." *Id.* at 1086.

The Court first finds that Plaintiff has plausibly alleged that the restrictive conditions at the January Center amounted to continued detention past his release date. The conditions are distinctive from those at a traditional halfway house, even if not equivalent to the actual imprisonment at a state correctional facility in *Hurd*. Because the prison in *Hurd* is distinguishable from the January Center, the Court has held that *Hurd* would not have put Ludovico on notice that he would be violating Plaintiff's rights by placing Plaintiff there, so Ludovico is entitled to qualified immunity. But that is a separate inquiry from whether Plaintiff has *plausibly alleged* overdetention at the motion to dismiss stage against other Defendants. Drawing all reasonable inferences in his favor, as the Court must at this stage, Plaintiff has plausibly alleged that he was detained past his mandatory release date.

First, the January Center shares the grounds of Corrigan Correctional Center, a high security prison, and is surrounded by a high fence of barbed wire. ECF No. 17 ¶ 33. Plaintiff was threatened with being charged with the crime of escape should he leave the premises without permission and a chaperone, or with a violation of special parole if he was found to have contraband. *Id.* ¶¶ 36–38, 47. Contrary to the Connection Defendants' arguments, the January Center's location on the site of a high-security prison and surrounding barbed wire support a reasonable inference that Plaintiff was physically unable to leave. Especially given the threats of arrest, Plaintiff also need not have alleged that he actually "attempted to leave and was stopped" to draw the reasonable inference that Plaintiff was not free to do so. ECF No. 42-1 at 8.

Plaintiff also raises various allegations about life inside the January Center, showing that he was subject to conditions similar to those in the correctional facility he had left. He alleges that there was 24/7 security with video cameras located in the halls and gym. *Id.* ¶ 40. January Center employees were able to search individuals' bodies, rooms, or conduct random drug tests. *Id.* ¶¶ 41,

44.  Any visits, which were supervised, needed to be pre-approved by DOC itself.  *Id.* ¶ 43.  The January Center also limits available reading materials and television programming, requires residents to fit their personal effects into four standard-sized banker boxes, and limits residents to possessing five pairs of pants, five shirts, and ten undergarments.  *Id.* ¶¶ 42, 45–46.  These allegations are sufficient to raise a plausible inference that placement at the January Center is tantamount to continued imprisonment.

The Court is mindful that the Connecticut Supreme Court reached a different conclusion on a similar Eighth Amendment claim involving a probationer in *Imperiale*, and that it has held in this ruling that the law is not clearly established that the January Center's conditions violate the Eighth Amendment for a special parolee.  The Connecticut Supreme Court's decision, however, was decided after development of a full factual record.  The Court acknowledges that the ability to leave the January Center—with permission and a chaperone—certainly distinguishes it from a more traditional detention setting.  But, when coupled with the alleged physical barriers and the threats of arrest, the Court's task at this juncture is determining whether Plaintiff has stated a *plausible* claim that the conditions at the January Center amounted to detention.  It concludes that Plaintiff has.  As the Second Circuit noted in *Hurd*, "[n]ext to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution."  984 F. 3d at 1085.  This value is embodied in the Eighth Amendment's prohibition against unauthorized detention.  For pleading purposes, Plaintiff has alleged a sufficiently serious deprivation of liberty against the Connection Defendants.  Following discovery, the trier of fact will be able to make factual findings about the conditions at the January Center, as the trial court did in *Imperiale*, to assess whether they rise to the level of an Eighth Amendment violation.

Turning to the state of mind element of an Eighth Amendment violation, the Connection Defendants' motion to dismiss and reply brief focus on "state of mind" as to the *individual* Connection Defendants; they ignore whether Plaintiff has plausibly alleged that Connection itself acted with deliberate indifference. The Court will therefore treat this point as conceded with respect to Connection itself, and will allow the Eighth Amendment claim to proceed against it.[7]

As to the individual Connection Defendants, the Court cannot find that Plaintiff has alleged the requisite state of mind for an Eighth Amendment violation. There is no explicit mention in the amended complaint of the states of mind of Ring, Hirsch, and Wisniewski, nor allegations of specific actions from which a sufficiently culpable state of mind could be inferred. Plaintiff rests on the fact that these Defendants are members of Connection's small 24-person staff, communicated threats of arrest as part of their jobs, and would observe the restrictive conditions at the January Center when they went to work every day. But even when drawing all reasonable inferences in Plaintiff's favor, the Court finds this insufficient to allege *deliberate* indifference. Although the fact that individual Defendants communicated threats of arrest suffices to demonstrate their personal involvement at a basic level, it does not suffice to show deliberate indifference to Plaintiff's constitutional rights, without more. Thus, Count Two is dismissed against the individual Connection Defendants, but not Connection.

---

[7] The Court notes that Connection cannot be liable for its employees' actions under a theory of *respondeat superior*, and that private employers are typically not liable under section 1983 for the constitutional torts of their employees unless the plaintiff demonstrates they took action "pursuant to official policy of some nature." *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (cleaned up); *see also Cruz v. Corizon Health Inc.*, No. 13-CV-2563 (CS), 2016 WL 4535040, at *8 n. 11 (S.D.N.Y. Aug. 29, 2016) (noting that private entity performing governmental function of health care for prisoners "enjoys the benefit of the *Monell* requirements") (quoting *Bess v. City of N.Y.*, No. 11-CV-7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013)). Although Connection's opposition contains one cursory citation concerning whether a conclusory allegation about creating a policy or custom is sufficient to state an Eighth Amendment claim, it devotes no analysis to whether the amended complaint sufficiently alleges Connection advanced such a policy. *See* ECF No. 42-1 at 10. Thus, this argument is insufficiently developed to support dismissal, and the Court does not address the issue further.

D.  False Imprisonment Claim

Last, the Court finds that Plaintiff has plausibly alleged the tort of false imprisonment against all Connection Defendants.

The Court concludes that Plaintiff has plausibly alleged that the Connection Defendants intentionally restrained Plaintiff's liberty when they communicated to him that he would be arrested should he leave the January Center without permission—though it is a close question because Plaintiff's allegations concerning the Connection Defendants are thin.[8]  Under Plaintiff's theory of the case, the Connection Defendants knew that the conditions imposed at the January Center were restrictive enough to constitute a restraint on Plaintiff's physical liberty, and still threatened him not to leave the January Center without permission.  The amended complaint also plausibly alleges that Connection Defendants made these threats with the purpose of confining Plaintiff or, at the very least, knowing that, because of the threats, it was substantially certain that Plaintiff would be confined in some manner.  *See Rivera*, 248 Conn. at 31 (recognizing that a person may be liable for false imprisonment if "his act is done for the purpose of imposing confinement, or with the knowledge that such confinement will, to a substantial certainty, result from it").  Otherwise stated, the Connection Defendants took action knowing it would render Plaintiff unable to leave a confined space, against his own free will.

As noted above, negligent conduct may give rise to a false imprisonment claim, provided that the defendant also knows or acts in reckless disregard of the fact that confinement will, to a substantial certainty, result from his actions.  *Green*, 186 Conn. at 269.  For example, if a bank dishonors a plaintiff's check on the mistaken belief that it is forged or altered, that is only negligent conduct.  If the bank also then reports the plaintiff to the police, knowing that the plaintiff will

---

[8] Because the Connection Defendants have not argued otherwise, the Court assumes, without deciding, that the actions of the Individual Connection Defendants are attributable to the Connection itself.

almost certainly be arrested (and therefore confined within fixed boundaries against his or her consent), then the bank may be liable for false imprisonment even if it was only negligent in its initial assessment. *Id.* at 271 (citing *Weaver v. Bank of Am. Nat'l Trust & Savings Ass'n*, 59 Cal. 3d 428 (1963)).

For this reason, the Connection Defendants' sincere belief that this confinement was within their "wide latitude to impose conditions on probations that serve to foster the offender's reformation and to preserve the public's safety" under the Connecticut Supreme Court's decision in *Imperiale* does not change this outcome, at the pleading stage. ECF No. 42 at 12 (quoting *Imperiale*, 337 Conn. at 714).[9] As *Green* explains, a defendant may ultimately be mistaken about the grounds for his or her acts, but nevertheless be liable for false imprisonment because the defendant acted with the purpose of confining the plaintiff or knew or acted in reckless disregard of the fact that confinement was likely to occur as a result of his or her actions. *Green*, 186 Conn. at 270. The Court recognizes that a plaintiff may not plausibly allege false imprisonment when he is lawfully in prison custody. *See McGowan v. United States*, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015) ("If a private or state actor is entitled to hold a prisoner, liability for false imprisonment never rises or falls based on the conditions under which he is held. . . . The inquiry ends, at least for purposes of the tort of false imprisonment, upon the finding that some form–any form–of confinement was legally permitted."), *aff'd*, 825 F.3d 118 (2d Cir. 2016). But Plaintiff's term of incarceration has indisputably ended, and he is challenging the very fact of (what he alleges to be) his continued confinement. Thus, the Connection Defendants' argument that the alleged false

---

[9] If the Connection Defendants only acted negligently in this regard, it is possible they could be entitled to statutory immunity under Conn. Gen. Stat. § 4-165, similar to Ludovico, if the Court were to find that the Connection Defendants are "state employees" or "state officers" for purposes of the immunity statute. As the Connecticut Defendants have not made that argument on their motion to dismiss—and indeed made it first in their opposition to Plaintiff's motion for reconsideration, without citation to any relevant authority—the Court does not address it here. *See* Connection Defs.' Opp. Mot. for Recons., ECF No. 70.

imprisonment was within their authority does not, at this stage, defeat the plausibility of Plaintiff's claim.

For these reasons, this claim may proceed against all Connection Defendants.

**VI.   CONCLUSION**

For the reasons explained in this Ruling, the State Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Specifically, the State Defendants' motion to dismiss is granted insofar as the Court finds that Ludovico is entitled to qualified immunity on the Fourteenth and Eighth Amendment claims and absolute immunity on the false imprisonment claim, and the false imprisonment claim against Zaccagnini is dismissed.  It is denied as to the First Amendment claim, as the Court finds that Plaintiff has adequately alleged First Amendment injury in fact, and is denied as to the Fourteenth and Eighth Amendment claims asserted against Zaccagnini in her official capacity.  Additionally, the Connection Defendants' motion to dismiss is GRANTED IN PART as to the constitutional claims against the individual Connection Defendants, and DENIED IN PART as to the Fourteenth and Eighth Amendment claims against Connection, and the false imprisonment claim against all Connection Defendants.

Plaintiff's motion for leave to file a second amended complaint is GRANTED IN PART and DENIED IN PART, as the Court will allow Plaintiff to file a second amended complaint to supplement his allegations related to First Amendment claim, as he had planned, and to attempt to address the deficiencies with his first amended complaint addressed in this ruling.  Plaintiff may file that second amended complaint by **March 28, 2024**.[10]

---

[10] The Court grants Plaintiff leave to amend only the claims already alleged in the amended complaint.  To the extent Plaintiff seeks to bring any new causes of action, he must file a motion for leave to amend, which Defendants will have the opportunity to oppose.  Any such motion for leave to amend will be governed under Federal Rule of Civil Procedure 15, since no scheduling order has yet issued.  *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).

**SO ORDERED** at Hartford, Connecticut, this 7th day of March, 2024.

　　　　　　　　　　　　　　　 _/s/ Sarala V. Nagala_
　　　　　　　　　　　　　　　SARALA V. NAGALA
　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE